**Bijan GHADERI, Plaintiff,**

v.

**UNITED AIRLINES, INC., Defendant.**

**Civ.No. C–00–00014 WDB.**

United States District Court,
N.D. California.

March 16, 2001.

John J. Riley, San Francisco, CA, for Plaintiff.

Brendan Dolan, John C. Fish, Jr., Brobeck, Phleger & Harrison, LLP, San Francisco, CA, for Defendants.

## ORDER REMANDING CASE
## TO STATE COURT

BRAZIL, United States Magistrate Judge.

The Ninth Circuit's opinion in *Tosco Corp. v. Communities for a Better Envi-*

*ronment,* 236 F.3d 495 (9th Cir.2001), prompted the court to revisit the issue of whether or not it has diversity jurisdiction over this action.

The parties submitted supplemental briefs and additional evidence and, on March 7, 2001, presented oral argument.

## I. THE GOAL

■ In order to determine United Airlines' "citizenship," we must identify the *one* state that is most appropriately considered United's "principal place of business."[1] If United's principal place of business is Illinois the court must retain jurisdiction. On the other hand, if we conclude that California is United's principal place of business the parties are not diverse, and the court must remand.

We note at the outset that it appears that United is not the kind of litigant that diversity jurisdiction was intended to protect in either California or Illinois. United maintains a large presence in both states and is unlikely to be considered an "outsider" in either.

Because United is unlikely to suffer discrimination in either state, the court has struggled with how to choose the *one* state most appropriately considered its "principal place of business." Of course, we do not make this determination in a vacuum. Several well-established public policies as well as Ninth Circuit case law guide us in this context.

## II. THE POLICIES

■ We must honor the following policies (aptly enumerated by plaintiff's counsel at the March 7 hearing).

- Public policy favors allowing state courts to adjudicate state law claims: The diversity statute is to be strictly construed against intruding on the rights of the states to decide their own controversies.

- Public policy favors reducing the federal courts' diversity case load in favor of allowing states to resolve their controversies when it is appropriate to do so: Federal courts are courts of limited jurisdiction. Accordingly, courts should strictly construe the removal statute. There is a presumption against removal and federal courts must reject jurisdiction if there is doubt about the right of removal in the first instance.

- The primary purpose of the diversity statute is to avoid prejudice against "outsiders." Parties who have a great deal of contact with the public in a particular state are not likely to be considered outsiders and, therefore, are not likely to be victims of discrimination by "locals."

- Public policy favors avoiding waste of both litigants' and judicial resources: If the parties were to proceed through trial in this court after an erroneous finding that the court has diversity jurisdiction the resources devoted to the litigation by the parties and the court would have been wasted. The federal judgment would be invalid, and the parties would have to relitigate in state court. In contrast, if the court erroneously remands to state court, a state court will resolve plaintiff's state law claims in a forum in which United maintains a substantial presence. Little, if any, harm will follow.

These policies must drive doubt resolution in this context. Each directs us to remand, where appropriate.

---

1. A corporation is a citizen of the state in which it is incorporated and the state that is its principal place of business.

## III. *THE "TESTS"*

■ In the Ninth Circuit, the court must apply one of two tests in order to identify United's "principal place of business," *i.e.,* its place of corporate citizenship. If any state contains a "substantial predominance" of United's corporate business activities, the court applies the "place of operations" test. *Industrial Tectonics, Inc. v. Aero Alloy ["ITI"]*, 912 F.2d 1090 (9th Cir.1990). The state that substantially predominates is United's principal place of business.

■ Before the Ninth Circuit issued its opinion in *Tosco*, it was unclear whether, in applying the substantial predominance test, courts were to compare the corporation's business activity in the state in issue to the corporation's business activity in all other states combined, thus determining whether there was any one state in which a "majority" of the party's business activity took place, or whether, in applying this test, the courts were to compare, one at a time, the state in issue to each other individual state in which the company was present. *Tosco* resolved this uncertainty—declaring that "determining whether a corporation's business activity substantially predominates in a given state plainly requires a comparison of that corporation's business activity in the state at issue to its business activity in other individual states. [citations omitted.] Thus, 'substantial predominance' does not require the majority of a corporation's total business activity to be located in one state, but instead, requires only that the amount of [the] corporation's business activity in one state be significantly larger than any other state in which the corporation conducts business." *Tosco*, 236 F.3d at 500.

■ The alternative test for identifying a corporation's principal place of business is to be used only if, applying the "place of operations" test as clarified in *Tosco*, the party seeking to invoke federal jurisdiction proves that "no state contains a substantial predominance of the corporation's business activities." *Tosco*, 236 F.3d at 500 *quoting ITI*, 912 F.2d at 1094. That alternative test is known as the "nerve center" test. Under it, the state in which United performs its executive and administrative functions is its principal place of business.

The precedents suggest that there is a preference in the Ninth Circuit for the place of operations test. "The 'nerve center' test should be used *only* when no state contains a substantial predominance of the corporation's business activities." *ITI*, 912 F.2d 1090 emphasis added.[2]

As the Ninth Circuit points out, the "place of operations" test is most appropriate because lawsuits usually arise from a corporation's public contacts. Deeming a corporation a citizen of the state with which it has the most public contact and, therefore, the "greatest potential for litigation," helps reduce the federal court diversity case load. *ITI*, 912 F.2d at 1094. Moreover, where a party has substantial contact with the public, the public is not likely to view it as an "outsider" and not likely to discriminate on the basis of citizenship.

■ We consider several factors to determine whether any state contains a "substantial predominance" of United's corporate activity including "the location of employees, tangible property, production activities, sources of income, and where sales take place." *Tosco*, 236 F.3d at 500 *citing ITI*, 912 F.2d at 1094.

---

2. *See also, ITI,* 912 F.2d at 1093 ("The Egan court was *forced* to use the 'nerve center'....") ("[T]he Sixth and Tenth Circuits focused on the 'nerve center' test, *but only because* there was no state where the majority of corporate ...") emphasis added.

Before assessing the pertinent evidence, we point out that the law clearly places the burden of persuasion on these issues on the party seeking to invoke the court's diversity jurisdiction. *ITI*, 912 F.2d at 1092. Thus United must prove, under the *Tosco* test, that California does not contain a substantial predominance of its business activity. In considering the evidence, doubts must. be resolved against United.

## IV. *THE NUMBERS*

The parties submitted evidence on a variety of factors relating to United's business activities in California and in Illinois during the 1999—2000 time period.[3]

### A. *Employees*

One of our goals is to determine in which state United had the most public contact and the greatest potential for litigation. We strongly suspect that angry consumers and angry employees are sources of a majority of litigation that corporate parties face. Therefore, for our purposes, employees are important in two respects. First, we must consider the bare number of employees in each state. Employment relationships with local people constitute contact with the public and, as just stated, are likely to be a primary source of litigation. Moreover, the more local people United employs in a state, the more well known it is in that jurisdiction. Second, we consider which types of employees interact with the public—*i.e.,* the consumers. The more employees in positions that interact with consumers—the greater the public contact ·in that state.

The evidence supports a finding that in January 2000, 31.6% of United's employees were employed in California while 23% were employed in Illinois.

Of these, the categories of employees with whom the public has the most contact are: flight attendants, reservation employees and customer service representatives. United employed 31% of its flight attendants in California and 24% of its flight attendants in Illinois. United employed almost the same percentage of reservation employees in each state—25% in California and 24% in Illinois. And, of United's customer service representatives 25% were employed in California but only 11% were employed in Illinois.[4]

Based on the percentage of local people employed in California and in Illinois and on the percentage of employees in each state who interacted with the public, United clearly had greater contact with the public in California.[5]

### B. *Consumers/ (Service Provided)*

Consumers of United's services include passengers and those shipping cargo. In 1999 24% of United's passengers on board at the time of departure were located in California and 18% were in Illinois.[6] In

---

3. Jurisdiction must be assessed as of the time of removal. Defendant filed its Notice of Removal on January 3, 2000.

4. United directs us to data about other types of employees that are more favorable to its position, but those categories of employees are much less significant than those we discuss in the text when "significance" is defined by the policies that drive our analysis.

5. United argues that mechanics (54.5% of whom are located in California) accounted for a large percentage of its total employees and

that because the public rarely, if ever, interacts with mechanics the difference between California and Illinois is less meaningful. As we just explained, however, public contact includes employment of local people. Therefore, the fact that over half of United's mechanics were California residents supports a finding that United had more public contact in California than in Illinois.

6. The court deems this figure more important than the number of departures—of which both states account for 18% of United's total. The number of actual on board passengers is

that same year, as measured by tonnage, cargo shipped to, from or through California accounted for 29% of cargo shipped by United. Cargo shipped to, from or through Illinois accounted for 20.75% of the cargo shipped by United.

These numbers indicate that United provided more services directly to the public in the state of California than to the public in the state of Illinois.

## C. Tangible Property

According to United, in 1999, the "replacement cost" of its assets in California amounted to $1,360,775,410 or 36.15% of its total assets. The replacement cost of assets in Illinois amounted to $794,148,463 or 21.2% of the total assets.

United points out, however, that these numbers exclude spare parts and aircraft. According to United, aircraft are "moveable assets." It is the court's view that their replacement value, $10 billion, cannot be attributed to any one state.

United also owns land in Illinois purported to be worth $5 million in 1999. This sum is not included in the value of its Illinois assets. United owns no land in California. It does, however, lease substantial property in this state. Neither party assigned a monetary value to United's California leases, but it is likely they had substantial market value.

In any event, the record demonstrates that, overall, the value of United's California property exceeded the value of its Illinois property.

## D. Sources of Income

United derives income primarily from passenger and cargo revenue. Forty one percent of United's 1999 revenue derived

more representative of contact with the public than the bare number of aircraft departures.

from flights departing from, arriving in or connecting through California. The comparable figure for Illinois is just over 30%.

The revenue associated with cargo shipping is confidential and has been filed under seal. However, as one might expect from the tonnage numbers, California accounts for more 1999 cargo revenue than does Illinois.

## E. Locus of Other Commercial Transactions

United's declarations indicate that it made more of the purchases that support its operations (e.g., that United signed most contracts for fuel, food, and equipment) from its headquarters in Illinois than from its offices in California. United has failed to prove, however, that it engaged in these kinds of transactions primarily with residents of Illinois, or that in some other way most of these transactions substantially increase its visibility or presence in Illinois, or that these kinds of transactions give rise to more litigation than United's interactions with its customers (passengers and shippers) and its employees.

## F. Executive and Administrative Functions

The court in *Tosco* also took into account where the corporation's executive and administrative functions took place.

It is clear that United's executive and upper-level administrative functions were conducted primarily in Illinois—as were some other central and less public "operations."[7] Nonetheless, "management" activity in California was hardly de minimis—as evidenced by the fact that 32.4% of United's managers resided in California.

7. United submitted evidence that its "OCC" located in Illinois conducts "operations" type work, including dispatch, scheduling, and air traffic control.

## V. DISCUSSION

It is clear that United engages in more business activity in California than in Illinois.[8] This is true even when we take fully into account the higher level management functions that are performed in Illinois. It is against this backdrop that we must determine whether United has met its burden of proving that its business in California does not constitute a "substantial predominance" of United's corporate activity.

The authorities do not provide us with a map or formula that would enable us to identify with certainty the boundaries of the concept of "substantial predominance." While *Tosco* clearly places the burden on United to prove that its presence in California does not " 'significantly' outweigh its presence in any other state," neither that opinion nor any other defines the word "significantly" in this doctrinal context. Instead, the authorities suggest that courts must address this kind of question on a case by case basis, taking into account each of the many pertinent circumstances as they present themselves uniquely in each litigated setting. In other words, instead of mechanical applications of formulae, these determinations are essentially matters of situation specific judgment. Those judgments must be informed and guided by the policies that we identified in the first section of this Order.

Those well-established policies instruct federal district courts to approach invocations of diversity jurisdiction with caution and to resolve doubts against parties whose only basis for proceeding in federal court is an alleged diversity of citizenship. And it is those policies that inform the Ninth Circuit's clear preference for use of the "place of operations" test for determining a corporate party's principal place of business. It follows that it would offend the fundamental principles that drive the development of doctrine in this area to give the term "substantial predominance" a broad definition in this context—*i.e.*, to define that concept in a way that would make it relatively easy for a corporate party to persuade the courts to apply the nerve center test.

■ We hold, therefore, that at least in a setting like this, where the corporation engages in a great deal of business activity in the state in issue, and where it engages in more of the kind of activity that matters most (analytically) in that state than in any other state, the courts should give the term "substantial" a relatively narrow meaning—and thus should decline to resort to the nerve center test unless the corporation proves that the difference between the levels of business activity in the states being compared is relatively insignificant. Stated differently, where the corporate party attempting to invoke diversity jurisdiction has a significant presence in both states of comparison, the difference between the magnitude of activity in the two states need not be very large to be considered "substantial."

The record before us reflects a pretty constant pattern in the business activity figures that matter most: United's activity in these categories is between 20% and 33% greater in California than it is in Illinois (the percentages of company-wide activity being, approximately, 30% to 25% in some instances, and in others 30% to 20%, approximately). California is the state in which United conducts the most public activity and in which it can expect to be involved in the most litigation. While United's business activity in Illinois also is significant, most of the types of activity for

---

8. Although we assess the existence of jurisdiction at the time of removal—just over a year ago, we have no reason to believe that United's 2000–2001 data is materially different than its 1999–2000 data. Therefore, for ease of writing we use the present tense.

which the figures are larger in Illinois involve matters that are less public, *e.g.,* OCC operations, signing contracts to purchase fuel, food and equipment, and high-level corporate policy making.

It is our judgment that, in the setting here presented, the differences in levels of corporate activity between California and Illinois in the categories that matter most analytically are sufficiently large to be deemed "substantial" as a matter of law. We hold that United has failed to prove that the differences between its business activities in California and in Illinois are insubstantial or insignificant. It follows that United has failed to persuade us that we should resort to the nerve center test. Applying the preferred "place of operations" test, we hold that United's principal place of business, as that phrase is used in diversity jurisdiction doctrine, is California.

## VI. *CONCLUSION*

Under the holding just announced, plaintiff and United are citizens of the same state. There being no federal question in this case, and no other proffered basis for subject matter jurisdiction in federal court, we must REMAND this matter to the courts of the state of California.

IT IS SO ORDERED.